**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**TONDANELL BARRON-GREEN,**                    Case No. 1:18 CV 1705

    Plaintiff,

    v.                                                              Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                              MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Tondanell Barron-Green ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in May 2015, alleging a disability onset date of April 9, 2010. (Tr. 262-69). Her claims were denied initially and upon reconsideration. (Tr. 197-202, 207-18). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 219-20). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on June 6, 2017. (Tr. 95-131). On November 15, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 16-25). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4); *see* 20 C.F.R. §§

404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on July 23, 2018. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Plaintiff was born in March 1964, making her 46 years old on the alleged onset date, and 53 years old on the date of her hearing. *See* Tr. 262. She had past work as the manager of a group home and as a security guard. (Tr. 105, 107-08). Plaintiff left her job due to arthritis in her legs which kept "giving out" on her. (Tr. 107).

Plaintiff testified that diabetic nerve pain and arthritis through her legs and feet were her most significant medical problems; she "just c[ouldn't] move around" like she used to. (Tr. 108). Plaintiff also had arthritis in her left hand and neck. (Tr. 110). She treated her nerve pain with various over-the-counter and prescription medications, of which, the gabapentin helped "a little bit". (Tr. 109-10). She treated her arthritis with a combination of Tylenol and Meloxicam, which she again stated helped "a little bit". (Tr. 111). Plaintiff did not like receiving shots in her knee and was uncomfortable with the idea of a knee replacement. (Tr. 111-12).

Plaintiff estimated she could lift "maybe about twenty pounds". (Tr. 112). She did not stand often; she sat and lay down "a lot" and was "uncomfortable all the time." (Tr. 112-13). Plaintiff stated she could not walk to the corner of her street without tiring or sitting down. (Tr. 113).

Plaintiff lived with her four adult sons and two granddaughters (ages eight and twelve). (Tr. 101-02). She performed some "light" household chores such as making her bed and vacuuming the floors; her sons did the rest. (Tr. 102-03). Plaintiff bathed and dressed herself but it took her "a while". (Tr. 103). She did not cook meals for the family, but could prepare simple meals for herself. *Id*. Her sons and daughter-in-law grocery shopped. (Tr. 104).

Plaintiff did not belong to any clubs or social organizations; she saw her mother, who lived close by, once a month. (Tr. 103-04). She did not drive due her medications which made her tired; her son drove her places when needed. (Tr. 104). Plaintiff did not have any hobbies; she watched television "a lot". *Id*.

Relevant Medical Evidence

Plaintiff saw internist Brenda Smith, M.D., for a new patient visit in September 2010. (Tr. 395). She reported trouble sleeping, fainting/blackouts, nervousness/anxiousness, depression, joint pain (bilateral hands), joint stiffness (bilateral ankles), low back pain, and neck pain. (Tr. 396-97). Dr. Smith noted Plaintiff had diabetes mellitus which was "fairly well controlled." (Tr. 396). She diagnosed, *inter alia*, unspecified joint pain. (Tr. 399).

In October 2014, Plaintiff reported left-hand pain and "[e]pisodic" knee pain to Gaby Khoury, M.D[1]. (Tr. 441-43). She denied numbness or tingling in her feet. (Tr. 442). On examination, Plaintiff had mild tenderness over the medial aspect of her left knee with no effusion, and mild tenderness over her left hand (mostly near the carpal bones). (Tr. 443). Plaintiff saw Dr. Khoury again in December 2014; she reported occasional numbness and tingling in her feet. (Tr. 439). In June 2015, Plaintiff reported diffuse muscle pain, but denied numbness or tingling in her hands and feet. (Tr. 434). She told Dr. Khoury that she had not been in sooner due to lack of insurance. *Id*. On examination, Dr. Khoury found Plaintiff had intact sensation and normal distal pulses in her feet. (Tr. 435).

An October 2015 x-ray of Plaintiff's spine – performed due to neck pain radiating to the left arm – revealed mild narrowing of the C5-C6 intervertebral disc space with spurring from the

---

1. Dr. Khoury is sometimes referred to in the record as "Dr. El-Khoury". *See, e.g.,* Tr. 449. For consistency, the undersigned refers to him herein as "Dr. Khoury".

inferior endplate of C5 and minimal narrowing of the C4-C5 intervertebral neural foramen on the right side. (Tr. 468). These were described as "mild degenerative changes". *Id*.

Plaintiff saw Dr. Khoury again in November 2015 to discuss x-ray results and neck pain. (Tr. 473). Plaintiff's neck pain was ongoing with occasional tingling in her left thumb. (Tr. 475). Further, Plaintiff reported feeling depressed with decreased motivation and changes in appetite and sleeping habits. *Id*. Dr. Khoury diagnosed neck pain and depression. (Tr. 476).

Later in November 2015, Plaintiff attended a consultative examination with Eulogio Sioson, M.D. (Tr. 451-55). Plaintiff reported pain in her lower back, knees, neck, and ankles. (Tr. 451). The pain in her knees and ankles arose after walking for five minutes, going up/down ten steps, or standing less than five minutes. *Id*. She "sometimes" drove; she did her own laundry, "light" cleaning, cooking, dishes, and grocery shopping. *Id*. Her son did the "heavy" household chores. *Id*. Plaintiff could dress, shower, button, tie, and grasp. *Id*. She could not comb her hair due to shoulder pain. *Id*. Plaintiff estimated she could lift and carry five pounds and rated her pain at 7/10. *Id*. Plaintiff also reported a history of depression, brought on by her daughter's death in 2012. *Id*. She had suicidal thoughts in the past with no attempts, poor sleep, and poor appetite. *Id*. Plaintiff felt tired "all the time" and hopeless "sometimes". *Id*. She had memory and concentration issues and "sometimes" heard voices. *Id*. On examination, Dr. Sioson found Plaintiff walked normally with no assistive device; she lost her balance trying to heel/toe walk, and declined to squat due to back pain. (Tr. 452). She could get on and off the examination table. *Id*. Plaintiff had tenderness in her left knee and limited range of motion in her left shoulder (which she attributed to her neck pain). *Id*. She could grasp and hold a 1.6-pound dynamometer and manipulate with each hand; she could handle a clipboard, personal items, pill containers, and papers. *Id*. Dr. Sioson also found Plaintiff had tenderness in her neck and lower back and negative straight leg tests. *Id*.

She was alert, oriented, and cooperative with no abnormal behavior. *Id*. Dr. Sioson diagnosed neck/back/joint pain, hypertension, and diabetes mellitus with probable peripheral neuropathy. *Id*.

Also in November 2015, Plaintiff attended a consultative examination with psychologist J. Joseph Konieczny, Ph.D. (Tr. 457-60). Plaintiff reported recent depression and an overall history of depression since her daughter's death in 2012. (Tr. 458). She was tearful during the session and reported daily crying episodes. *Id*. Plaintiff had some tremulousness in her legs during the session, stating "I get nervous". *Id*. Plaintiff appeared well groomed with adequate hygiene. *Id*. She had some psychomotor retardation. *Id*. Plaintiff was subdued and tearful, but cooperative. *Id*. She had adequate motivation and participation throughout the evaluation. *Id*. Plaintiff had clear and coherent speech but poor eye contact. *Id*. She was oriented to person, place, and time; showed no indication of impairment in her ability to concentrate or attend tasks, and showed no deficits in her ability to perform logical abstract reasoning. (Tr. 458-59). Plaintiff also had fair insight and judgment. (Tr. 459).

Plaintiff saw Carla Baster, D.O., in December 2015 because her knee "went out" as she walked out a door; she fell, twisted her leg, and landed on her back. (Tr. 579). Plaintiff reported pain from her hip to her knee. *Id*. On examination, she had generalized knee pain and "very limited" range of motion. *Id*. Dr. Baster found Plaintiff difficult to examine because Plaintiff could not flex her knee. *Id*. Further, Dr. Baster found Plaintiff had tenderness through her lateral hip and upper leg; she refused a range of motion examination in this area. *Id*. Dr. Baster diagnosed a left knee strain and ordered x-rays. (Tr. 580). A left hip x-ray revealed "no acute osseous or articular abnormality", and a right knee x-ray revealed "moderate tricompartment left knee osteoarthritis" with "no acute osseous or articular abnormality". (Tr. 584).

Plaintiff returned to Dr. Khoury in March 2016 reporting chronic numbness in her left hand, and that her left knee kept "giving out" on her since her December 2015 fall. (Tr. 592). Plaintiff further reported crying "a lot" when thinking of her deceased daughter. *Id*. Dr. Khoury diagnosed chronic neck and left knee pain, and major depressive disorder (recurrent) of unspecified severity. (Tr. 594).

Plaintiff treated with psychologist Stacy Caldwell, Ph.D., in April 2016 for bereavement assistance. (Tr. 601). Plaintiff reported her daughter's prior passing from cancer and she felt like her grief was "always there". (Tr. 602). She took Zoloft previously, but stopped after two weeks because she "did not feel better and it made her feel stuck – no emotion / numb". *Id*. Plaintiff felt "agitated" and "irritable" daily; she had anxiety, trouble relaxing, weekly panic attacks, racing thoughts, increased grief and depression, and hallucinations. *Id*. On examination, Plaintiff exhibited "signs of neglect", had an anxious mood, normal speech, logical thought process, tight association, fair judgment, poor memory, sustained attention and concentration, depressed mood, and congruent affect. (Tr. 606). Dr. Caldwell diagnosed unspecified anxiety disorder, major depressive disorder, and persistent complex bereavement. (Tr. 607). She recommended counseling and psychiatric services. *Id*.

Plaintiff treated with Antwon Morton, D.O., at the Department of Physical Medicine and Rehabilitation in May 2016. (Tr. 619-22). Plaintiff reported neck pain with a tingling sensation that radiated into her left arm and hand, and was aggravated by overhead activities and sleeping on her left side. (Tr. 619). She used a copper sleeve on her left arm which helped with the pain. *Id*. Plaintiff also had left knee pain, which was aggravated by stairs and prolonged walking. *Id*. On examination, Dr. Morton found Plaintiff had decreased cervical lordotic curvature and tenderness in her cervical paraspinals bilaterally. (Tr. 622). Plaintiff had tenderness in her left knee over the

medial and lateral joint lines along with mild crepitus with active/passive knee flexion and extension. *Id*. She had normal sensation and motor strength in all extremities. *Id*. Her fine motor coordination was normal and she exhibited an antalgic gait. *Id*. Dr. Morton diagnosed cervical spondylosis with radicular symptoms in her left upper extremity, gait disturbance, muscle tightness, and left knee osteoarthritis. *Id*. He recommended physical therapy and a trial of gabapentin. *Id*.

Plaintiff returned to Dr. Caldwell in July 2016. (Tr. 653). Plaintiff reported "that with new psychotropics, sleep is improved" but she had "muscle stiffness and aches when getting out of bed". *Id*. On examination, Plaintiff was adequately groomed and calm; she had slowed speech, logical thought process, tight association, poor judgment, normal memory, sustained attention and concentration, depressed mood, and constricted affect. (Tr. 654). By August 2016, Plaintiff reported reduced sleep quality and that she had become "more combative" and argued with others. (Tr. 660). On examination she was adequately groomed and calm, had a logical thought process, fair judgment, depressed mood, and constricted affect. (Tr. 661).

In September, Plaintiff returned to Dr. Morton reporting neck pain with a tingling sensation that radiated into her left arm and hand. (Tr. 691). On examination, Dr. Morton found Plaintiff had decreased cervical lordotic curvature and tenderness in her cervical paraspinals bilaterally. (Tr. 693). Plaintiff had tenderness in her left knee over the medial and lateral joint lines along with mild crepitus with active/passive knee flexion and extension. *Id*. Plaintiff had normal sensation and motor strength in all upper and lower extremities. *Id*. Her fine motor coordination was normal and she exhibited an antalgic gait. *Id*. He offered a similar assessment to that of May 2016, *compare* Tr. 693-94 *with* Tr. 622, and increased Plaintiff's gabapentin dosage (Tr. 694).

7

Plaintiff saw Dr. Caldwell later that month. (Tr. 700). She noted her primary care provider recommended a walking regimen, but was she reluctant due to fear of her knee giving out. *Id*. Plaintiff had refused knee injections due to a fear of needles. *Id*. On examination, Plaintiff was calm, oriented, exhibited fair judgment, had sustained attention and concentration, a depressed mood, and constricted affect. (Tr. 701).

At a pharmacological management session in October 2016, Plaintiff reported that she did not exercise, but "did mow the lawn". (Tr. 718). In December 2016, Plaintiff reported poor sleep quality, her left leg continued to give out on her, and she believed her body was "immune" to gabapentin. (Tr. 755). On examination, Plaintiff was cooperative, oriented, had paranoid thoughts, a bad mood, labile affect, sustained attention and concentration, normal memory, and fair judgment. (Tr. 755-56). Plaintiff reported (generalized) pain on her left side at 8/10. (Tr. 756).

Later that month, Plaintiff saw Dr. Khoury for a follow-up appointment reporting pain in her left hand, but denying numbness, tingling, or weakness. (Tr. 764). She also had left knee pain and reported falling in her driveway recently, "for no clear reason". *Id*.

A February 2017 x-ray of Plaintiff's left hand revealed "mild degenerative osteoarthrosis". (Tr. 773).

Plaintiff's son accompanied her to an April 2017 appointment with Dr. Caldwell. (Tr. 838). Plaintiff believed her mood swings had increased, and her son confirmed rapid mood changes, "often from irritable to sad, to angry to energetic". *Id*. On examination, Plaintiff was calm, oriented, had a logical thought process, poor judgment, normal memory, sustained attention and concentration, depressed and angry mood, and a constricted affect. (Tr. 839).

Opinion Evidence

In November 2015, Dr. Sioson opined "if one considers limitation of range of motion from pain and above findings, work-related activities would be limited to sedentary work." (Tr. 452).

Later in November 2015, Dr. Konieczny opined Plaintiff had "some mild limitations" in her ability to understand, remember, and carry out instructions due to intellectual limitations. (Tr. 459). She would have "some difficulty" maintaining focus and persistence in moderate to complex multi-step tasks due to her intellectual limitations and depressive symptoms. *Id*. Dr. Konieczny further opined that – due to her mood symptoms and intellectual limitations – Plaintiff would have "diminished tolerance for frustration and diminished coping skills" which would impact her ability to respond to typical supervision and interpersonal situations in the work setting. *Id*. Finally, he opined Plaintiff would require some degree of supervision and monitoring in the management of her daily activities and financial affairs. *Id*.

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 121-30. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was physically and mentally limited in the way in which the ALJ determined Plaintiff to be. *See* Tr. 123-26. The VE opined such an individual could not perform Plaintiff's past work, but could perform other jobs such as an inspector and hand packager, an assembler of plastic hospital products, or an assembler of electrical accessories. (Tr. 124-25).

ALJ Decision

In a written decision dated November 15, 2017, the ALJ found Plaintiff met the insured status requirements for DIB through December 31, 2014 and had not engaged in substantial gainful activity since her alleged onset date (April 9, 2010). (Tr. 18). She concluded Plaintiff had severe

impairments of: diabetes mellitus, diabetic polyneuropathy, mild osteoarthritis in the left hand, obesity, left knee osteoarthritis, cervical degenerative disc disease, loss of central visual acuity, affective disorder, anxiety disorder, and borderline intellectual functioning, but found these impairments (alone or in combination) did not meet or medically equal the severity of a listed impairment. (Tr. 18-19). The ALJ then found Plaintiff had the residual functional capacity ("RFC"):

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is able to stand and walk for two hours out of an eight-hour workday, is able to sit for six hours out of an eight-hour workday, push and pull limited in the left lower extremity to frequent foot controls; occasionally climbing ramps and stairs; never climbing ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; occasional overhead reaching bilaterally; avoid all exposure to hazards such as unprotected heights, dangerous machinery, and commercial driving; and frequent handling and fingering with the left upper extremity. The claimant can perform simple and routine tasks with no fast pace or high production quotas; with routine changes; with occasional superficial interaction with others (meaning of a short duration for a specific purpose); and can perform low stress work meaning no arbitration, negotiation, or responsibility for the safety of others and supervisory responsibility.

(Tr. 20). The ALJ found Plaintiff was unable to perform past relevant work; was defined as "a younger individual" on the alleged onset date, and was "closely approaching advanced age" at the time of the decision. (Tr. 24). She had at least a high school education. *Id*. The ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. *Id*. Thus, the ALJ found Plaintiff not disabled from the alleged onset date, April 9, 2010, through the date of the decision. (Tr. 25).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

11

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises a single challenge to the ALJ's decision – the RFC is unsupported by substantial evidence. (Doc. 11, at 14-20). Specifically, Plaintiff objects to the ALJ finding her capable of "light work", arguing the standing and walking restrictions imposed are legally inconsistent with this finding. *Id*. at 14. Plaintiff does not raise a specific objection to the mental RFC, only stating broadly that her "mental impairments do appear more debilitating than the RFC allows." *Id*. at 18. The Commissioner responds that there is no legal error with the physical RFC, and Plaintiff waived any argument as to her mental RFC. (Doc. 16, at 4-9). For the following reasons, the undersigned affirms the Commissioner's decision.

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence *Id.* §§ 404.1529, 416.929. While an ALJ must also consider and weigh medical opinions, the RFC determination is

expressly reserved to the Commissioner. *Ford v. Comm'r of Soc. Sec.*, 114 F. App'x 194, 198 (6th Cir. 2004); 20 C.F.R. §§ 404.1527, 404.1546, 416.927, 416.946. The Court must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ" even if substantial evidence or indeed a preponderance of the evidence *also* supports a claimant's position. *Jones*, 336 F.3d at 477.

To support her argument for a more limited RFC, Plaintiff contends that the "stand and walk for two hours out of an eight-hour workday" and "sit for six hours out of an eight-hour workday" restrictions (Tr. 20) are incompatible with light work as a matter of law and, as a result, the ALJ should have limited her to sedentary work[2]. (Doc. 11, at 14-19).

Under the regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b). "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6. Further, "[e]ven though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing – the primary difference between sedentary and most light jobs." *Id*. at *5. By contrast, in sedentary work, "a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required *occasionally*[.]" *Id*. (emphasis added). Particularly

---

2. As Plaintiff correctly notes, a "sedentary" work limitation is significant because such a determination automatically requires a finding of disabled for someone (like Plaintiff) who is "closely approaching advanced age" at the time of the decision. *See* 20 C.F.R. Part 404, Subpart P, App'x 2 § 201.14.

relevant here is what constitutes "occasional" walking and standing – "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." *Id*. Plaintiff contends the only appropriate resolution of the conflict between the ALJ's limited range of "light work" finding with more limited standing and walking abilities than a full range of light work is to automatically place her in the lower "sedentary" level.

To support her position, Plaintiff cites *Wilkerson v. Commissioner of Social Security*, 278 F. Supp. 3d 956, 969-70 (E.D. Mich 2017), for the proposition that "light work" is incompatible with a modified stand/walk requirement because there, the ALJ determined *Wilkerson* could not perform the minimum stand/walk requirement for "light work". Plaintiff, however, overlooks a relevant factual distinction in the *Wilkerson* holding – the ALJ determined Plaintiff was unable to perform the stand/walk requirement for "light work" *and* could not meet the minimum lifting requirement for "light work". *Id*. Here, the ALJ provided a "light work" restriction (including the lifting requirements) with only a modified stand/walk requirement. The weight of the authority is against the Eastern District of Michigan in *Wilkerson*, as this Court and the Sixth Circuit have already found that a two-hour stand/walk requirement is not incompatible with a "light work" determination.

For example, the plaintiff in *Blankenship v. Commissioner of Social Security*, 624 F. App'x 419, 428 (6th Cir. 2015), raised a substantially similar argument. She argued the ALJ erred in finding she could perform "light work" while also finding she could carry ten pounds frequently, or twenty pounds occasionally, and stand or walk for only two hours in an eight-hour workday. *Id*. In other words, the ALJ there assigned a lifting restriction consistent with "light work" paired with a stand/walk restriction more consistent with "sedentary work". *See* 20 C.F.R. §§ 404.1567(b),

416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."); 20 C.F.R. §§ 404.1567(a), 416.967(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.").The Sixth Circuit found there was no error where the ALJ accurately posed these limitations to the VE, *Blankenship*, 624 F. App'x at 429 ("ALJ Dowd's hypothetical fully accounted for the fact that Blankenship's foot ailments precluded her from performing a full range of light work."), and, in return, the VE "identified a significant number of jobs satisfying the strictures of Blankenship's RFC and consistent with her vocational background", *id*. In conclusion, the Sixth Circuit explained:

> Blankenship suggests that there is an either/or dichotomy between light work and sedentary work, and because she could not perform a full range of light work, she must necessarily have only been able to do sedentary work. But Blankenship does not provide any legal authority for this position, and likewise does not fully address the limitations built into ALJ Dowd's hypothetical.

*Id.*

Similarly, this Court in *Icke v. Commissioner of Social Security*, 2017 WL 2426246, at *7-8 (N.D. Ohio), held VE testimony that there were a significant number of jobs available for a *modified* "light work" RFC (where *Icke* was assigned a "light work" lifting restriction, paired with a "sedentary" stand/walk restriction) provided substantial evidence to support the ALJ's decision. In *Icke*, the plaintiff argued the ALJ's finding that he could stand or walk for four hours in an eight-hour workday was legally incompatible with a "light work" limitation. *Id*. at *7. Consistent with *Blankenship*, the Court concluded there was no error where the ALJ relied on VE testimony that there were a significant number of jobs in the economy which fell within these parameters. *Id*. at *8. Importantly, in *Blankenship*, *Icke*, and here, the ALJ accounted for the fact that a plaintiff's lower body ailments prevented him or her from performing a full range of "light work" and posed

15

such a hypothetical to the VE. *See* Tr. 123-26. Here, the VE opined there were a number of jobs available in the national economy Plaintiff could perform even with these limitations. (Tr. 126, 130)[3]; *see also* Tr. 24-25 (ALJ's citation of VE testimony). As such, the undersigned finds no error in the ALJ's physical RFC determination and affirms the Commissioner's decision in this regard.

*Mental RFC*

Plaintiff raises a rather cursory challenge to the mental RFC finding in this case. (Doc. 11, at 18-19). She states broadly that her "mental impairments do appear more debilitating than the RFC allows." *Id*. at 18. Plaintiff then cites two (brief) treatment notes and concludes her argument by stating "[t]he ALJ should have ordered a new consultative examination." *Id*. at 19. The Commissioner responds that Plaintiff's argument is waived because it is underdeveloped. (Doc. 16, at 6-7). Here, the ALJ included several mental accommodations in her RFC. *See* Tr. 20 (Plaintiff can perform "simple and routine tasks with no fast pace or high production quotas; with routine changes; with occasional superficial interaction with others (meaning of a short duration for a specific purpose); and can perform low stress work meaning no arbitration, negotiation, or responsibility for the safety of others and supervisory responsibility."). Because this argument does not raise a specific challenge to the mental RFC, or explain what accommodations Plaintiff contends the ALJ should have included, the undersigned concludes that it is waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient

---

3. As the VE testified, the identified jobs are each classified as "light work" and "unskilled." *See* Tr. 124-25; *see also* Assembler, Plastic Hospital Products, *Dictionary of Occupational Titles ("DOT")*, 712.687-010, 1991 WL 679245 (4th ed. 1991); Inspector and Hand Packager, *DOT*, 559.687-074, 1991 WL 683797; Assembler, Electrical Accessories I, *DOT*, 729.687-010, 1991 WL 679733.

for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)).

Plaintiff's assertion the ALJ should have ordered a new mental consultative examination, is also not well-taken. In support, she cites 20 C.F.R. § 404.1519a(b)(1) and (4) which provide that the Commissioner *may* order a consultative examination if additional evidence is needed and not contained in her records; and there is a change in Plaintiff's condition which is "likely to affect [her] ability to work, but the current severity of [the] impairment is not established." As its wording suggests, this regulation is permissive, rather than mandatory. *Lucas v. Comm'r of Soc. Sec.*, 2013 WL 1150019, *2 (N.D. Ohio) ("Ordering a consultative exam lies in the discretion of the ALJ."). Further, and more importantly, because Plaintiff does not point to any specific evidence that she meets either of these conditions for a new consultative examination, the undersigned concludes this argument is also waived.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI supported by substantial evidence and affirms that decision.

                                                          s/James R. Knepp II
                                                          United States Magistrate Judge